UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

GARY GORDON,

                Plaintiff,

v.                                                       Case No. 5:07-cv-505-Oc-GRJ

OCALA AUTOMOTIVE MANAGEMENT, LLC.,
d/b/a Honda of Ocala d/b/a Morgan Auto
Group,

                Defendants.
_____

## ORDER

Pending before the Court is Defendant, Ocala Automotive Management, LLC d/b/a Honda Of Ocala and d/b/a Morgan Auto Group's Motion For Final Summary Judgment. (Doc. 26.) Plaintiff has filed a response in opposition (Doc. 31) and therefore this matter is ripe for review.[1]

## I. Background

The following is a recitation of the material facts viewed in the light most favorable to the Plaintiff.[2] At all times relevant to this lawsuit, Defendant Ocala Automotive Management, LLC was doing business as Morgan Auto Group and as Honda of Ocala. Honda of Ocala is a new and used automobile dealership in Ocala, Florida. In April 2006, Gordon was hired as a new car sales manager at Honda of

---

[1] Also pending is Defendant's Motion To Strike Affidavit Of Gary Gordon And In The Alternative, Defendant's Motion For Leave To File A Reply To Plaintiff's Memorandum Of Law Opposing Defendant's Motion For Summary Judgment (Doc. 32) to which Plaintiff filed a response in opposition. (Doc. 33.)

[2] United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Ocala.[3] At the time Plaintiff was hired, the dealership focused on gross profit per vehicle, an approach with which Mr. Gordon agreed.[4]

In December 2006, Defendant brought in a new management team.[5] The new management team included Dwayne Hearl as General Manager and James Gierschke as General Sales Manager.[6] Gordon continued in his position as a new car sales manager, and was the direct supervisor of salespersons including Karen Boersma and John Simms.[7] The new management team shifted its focus to volume sales, as opposed to gross profit.[8]

Gordon preferred the gross profit approach and voiced concerns to Larry Morgan and other members of the sales force about the new management team's philosophy and management style.[9] Approximately one week before he was terminated, Gordon met with Larry Morgan at Chick-Fil-A in Ocala.[10] Gordon talked to Morgan about the dealership, including that the grosses had gone down, that abusive language was being

---

[3] Doc. 21 (Deposition of Gary Gordon, hereinafter "Gordon Deposition") at page 36.

[4] Gordon Deposition at page 101.

[5] Gordon Deposition at page 103.

[6] Gordon Deposition at pages 109, 124-25.

[7] Doc. 30 (Affidavit of Gary Gordon, hereinafter "Gordon Affidavit) at ¶2.

[8] Gordon Deposition at pages 117-20; Doc. 23 (Deposition of Doug Prendergast, hereinafter "Prendergast Deposition") at pages 29-31; Doc. 22 (Deposition of Dwayne Hearl, hereinafter "Hearl Deposition") at pages 9-11.

[9] Prendergast Deposition at pages 32-33; Doc. 24 (Deposition of Larry Morgan, hereinafter "Morgan Deposition) at page 25.

[10] Gordon Deposition at pages 210-11.

used and that morale was not what it used to be.[11] Morgan spoke with Hearl about Gordon's concerns.[12]

Gordon testified that he was present on three occasions when Gierschke, the General Sales Manager, made sexually explicit comments in front of Boersma. First, on one occasion, Gierschke looked out the window and said "[t]his weather really sucks . . . I wish I was home right now because I'd bend my wife over and do her doggie style. That would be a lot better doing that than being here."[13] He also asked Doug Pendergrast in front of Boersma, "when's the last time . . . you did your wife and how did you do her? And how is [sic] her breasts."[14] Third, he told Boersma that she had nice breasts.[15] While Boersma did not report these incidents, Gordon attests that she "found these episodes to be a pattern of harassment, culminating in the publication of an earlier police mugshot of her."[16]

On February 14, 2007 Boersma called Gordon on his cell phone and told him that Jim Schroeder, who was the finance manager for used cars, had put her mug shot from a prior arrest on his computer as a screen saver.[17] Boersma was upset because

---

[11] Gordon Deposition at pages 210-12.

[12] Morgan Deposition at 56-57.

[13] Gordon Deposition at page 150.

[14] Gordon Deposition at 151.

[15] Gordon Deposition at 154-55.

[16] Gordon Affidavit at ¶4. Defendant has moved to strike this affidavit on various grounds, which the Court will address in the Discussion section below.

[17] Gordon Deposition at 166-67.

everyone was looking at her mug shot and laughing at it.[18]  Despite her requests, Schroeder refused to remove the screen saver.[19]  Consistent with company policy, Gordon told Boersma to report the incident to the human resources department, which was located at the Tampa headquarters of Morgan Auto Group.[20]

On February 15, 2007, Boersma called Jamie Zebert, who was the human resources coordinator, to report the mug shot incident.[21]  Zebert contacted Gierschke and advised him that the finance manager had a picture of Boersma as his screen saver and directed him to have the screen saver removed.[22]  After the mug shot was removed from the computer, the following written disciplinary warning was prepared:[23]

> Karen Boersma notified her manager (Gary Gordon) on 2-14-07 of a screen saver that Jim Schroeder the Used Car Manager had up of her arrest.  Karen was distraught and did not come into work on 2-15-07 with her manager's approval. (Gary Gordon) told her to call Human Resources (Jamie Zebert). On 2-15-07 at 12:45 pm Karen called me and reported that Jim Schroeder had a picture of her arrest on his computer.  This is a violation of #15 which is (Abusive, discourteous, threatening, harassing or assultive [sic] behavior, conduct or language towards co-workers, other associates, volunteers or the public.) and of #18 which is (Unauthorized removal, use or possession of MAG property, or property of other staff members or anyone on MAG property.)  James Gierschkle [sic] was told by Jim Schroeder that he had the pictures up as a screen saver, and James Gierschkle [sic] had him remove them immediately as of 2-15-07.

---

[18] Gordon Deposition at pages 167-69, 176.

[19] Gordon Deposition at pages 168-69.

[20] Gordon Deposition at page 169; see also Doc. 25 (Deposition of Peri Blumer, hereinafter "Blumer Deposition") at pages 63-64 and Exhibit 7 (Morgan Auto Group Anti-Discrimination And Anti-Harassment, Including Sexual Harassment, Policy).

[21] Doc. 20 (Deposition of Jamie Zebert, hereinafter "Zebert Deposition") at pages 3-4.

[22] Zebert Deposition at page 9.

[23] Zebert Deposition at pages 6-7 and Exhibit 1.

4

Schroeder signed the written warning and it was placed in his personnel file.[24] Zebert distributed the disciplinary warning via office email to her supervisor Blumer, to used car sales manager Rick Carpenter and to Gordon's supervisor, Gierschke.[25]

At the time of the mug shot incident, Hearl was out of the office on vacation.[26] However, Gierschke called Hearl on his cell phone and advised him of the mug shot incident.[27] Hearl testified that prior to terminating Gordon, he was unaware of Gordon's involvement in encouraging Boersma to report the incident to human resources.[28]

On February 22, 2007, Hearl returned to the dealership for the first time since the mug shot incident.[29] That day, or the day before, Rick Carpenter and Sal Pistone, both of whom were used car sales managers, told Gordon that he did not need to instruct Boersma to call human resources and that they "would have taken care of it" at the Ocala dealership.[30] Gordon testified that the morning Hearl returned to the dealership, he saw Hearl and Carpenter in a "heated discussion" outside the used car building.[31] At the conclusion of the discussion, Hearl walked back into the new car building and

---

[24] Blumer Deposition at pages 70-72 and Exhibits 8 & 9; Zebert Deposition at pages 6-9.

[25] Zebert Deposition at pages 7-10.

[26] Hearl Deposition at page 37; Gordon Deposition at page 183.

[27] Hearl Deposition at pages 36-37.

[28] Hearl Deposition at pages 37-38.

[29] Gordon Deposition at page 183.

[30] Gordon Deposition at page 184.

[31] Gordon Deposition at pages 229-30.

pushed Gordon and said, "get upstairs in my office now."[32] Doug Prendergast, testified that Hearl "appeared to be mad" and "if I'm not mistaken, I think [Hearl] touched him on the arm or grabbed him by the shoulder or something like that."[33] Gordon testified that up in his office, Hearl told Gordon about his work history, told Gordon that he was not a "team player" and that he was tired of Gordon undermining him.[34] Gordon testified that Hearl did not offer any further explanation as to what he was doing to undermine Hearl.[35] Hearl then fired Gordon.[36]

No one witnessed this meeting and Hearl's account is different. Hearl testified that the morning he fired Gordon, Gierschke "came to him and said that [their] top sales person, John Simms, had come to him and said that [Gordon] was recruiting salespeople and trying to get [Gierschke] fired."[37] Simms attested that in February 2007, he told Gierschke that Gordon "had spoken openly on many occasions that [Gierschke] and [Hearl] did not know what they were doing and were essentially inept at their jobs" and that Gordon had encouraged other salespeople to voice concerns about

---

[32] Gordon Deposition at pages 192-93.

[33] Prendergast Deposition at page 18.

[34] Gordon Deposition at pages 194-201.

[35] Gordon Deposition at pages 195-96.

[36] Gordon Deposition at page 195.

[37] Hearl Deposition at page 24.

Hearl and Gierschke to Blumer or Morgan.[38]  Gordon denies ever encouraging or enlisting other salespersons to complain about Hearl or Gierschke.[39]

According to Hearl, within a half hour of his conversation with Gierschke, Hearl and Gordon had the meeting in his office.[40]  Hearl asked Gordon if he was conspiring to get Gierschke fired and Hearl testified that Gordon dodged the question.[41]  Hearl then asked Gordon what he would do if he was in Hearl's position and Gordon said "I would reprimand me."[42]  At that point, Hearl decided to fire Gordon.[43]

After Gordon was terminated, Hearl completed a "Separation Notice Form."  The form is "only kept at Honda of Ocala."[44]  According to Blumer, the Human Resources Manager, she probably received the completed "Separation Notice Form" in the mail four or five days after Gordon was terminated.[45]   The form stated that Gordon had been discharged due to his conduct – specifically, "[c]onspiring with salesperson to work against [department] head.  Admitted it when asked what he would do if he were me (GM).  He responded that he would reprimand me."[46]

---

[38] Doc. 19 (Affidavit of John Simms, hereinafter Simms Affidavit) at ¶¶3-6.

[39] Gordon Affidavit at ¶5.  Defendant has moved to strike Gordon's Affidavit on various grounds that the Court will discuss below.

[40] Hearl Deposition at pages 24-25.

[41] Hearl Deposition at page 25.

[42] Hearl Deposition at page 25.

[43] Hearl Deposition at pages 94-95.

[44] Blumer Deposition at page 18.

[45] Blumer Deposition at pages 18-20; Hearl Deposition at pages 22-23.

[46] Blumer Deposition at page 20 and Exhibit 1.

However, Gordon subsequently had a telephone conversation with Lisa Dahl, the comptroller for Honda. In Gordon's affidavit he attests that:[47]

> 8. The comptroller told me that she saw my "separation notice" shortly after my termination. She said the notice she saw contained the Dwayne Hearl signature at the bottom, but did not contain any remarks explaining the reason for my termination.
>
> 9. The comptroller also told me that, some time later, she witnessed Peri Blumer visiting the Honda of Ocala store and directing Dwayne Hearl and James Gierschke to meet in an office to get their stories straight and complete the separation notice.

Dahl is the records custodian for Honda of Ocala and keeps the records at a "sister dealership" in Gainesville.[48]

## II. Procedural History

Gordon received his notice of right to sue letter from the United States Equal Opportunity Commission on December 7, 2007, and he filed his timely Complaint in this Court on December 13, 2007. (Doc. 1). Gordon subsequently amended his Complaint. (Doc. 8.) Gordon's First Amended Complaint alleges retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*, and the Florida Civil Rights Act of 1992, Florida Statutes §760.10(7). Gordon alleges that he was terminated because he encouraged Boersma to report the mug shot incident. Gordon demands relief in the form of lost wages, lost benefits, pre and post-judgment interest, compensatory damages for emotional distress, punitive damages, front pay and/or reinstatement, and attorneys' fees and costs.

---

[47] Gordon Affidavit at ¶¶7-9. In its motion to strike, Defendant argues that this is inadmissible hearsay. The Court will discuss this argument below.

[48] Blumer Deposition at pages 10-11.

Following the conclusion of discovery, Defendant filed its motion for summary judgment on December 2, 2008. (Doc. 26.) Gordon filed his response in opposition on December 15, 2008. (Doc. 31.)

## III. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."[49] As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."[50] The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

## IV. Discussion

In order to establish a *prima facie* claim of retaliation under Title VII, a plaintiff must prove that: (1) he participated in protected activity; (2) he suffered an adverse

---

[49] Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).

[50] Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).

9

employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action.[51] If the plaintiff succeeds in establishing his *prima facie* case, the defendant must come forward with a legitimate, non-retaliatory reason for the adverse employment action.[52] However, the "plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct."[53]

There is no dispute that Plaintiff suffered an adverse employment action when he was terminated. However, there is a dispute on the other two elements of his *prima facie* case – i.e., whether Plaintiff engaged in protected activity and whether there was a causal connection between the protected activity and Plaintiff's termination -- as well as whether Defendant acted with a legitimate, non-retaliatory purpose. The Court will address each issue separately.

### *Protected Activity*

Plaintiff contends that he engaged in protected activity by directing Boersma to report the mug shot incident and opposing the incident with management. As an initial matter, Plaintiff seeks protection under both the participation clause and the opposition clause of §2000e-3(a). Plaintiff argues that Defendant's Motion for Summary Judgment

---

[51] Brown v. Snow, 440 F.3d 1259, 1266 (11th Cir. 2006); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998). The FCRA is closely patterned after its federal equivalent, and as such, the Court examines Plaintiff's claim of retaliation under the FCRA in the same manner as it evaluates Plaintiff's claim under Title VII. See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1387 (11th Cir. 1998.)

[52] Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001); Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).

[53] Olmsted, 141 F.3d at 1460.

only focuses on the participation clause claim. A review of the motion discloses, however, that Defendant broadly challenges the retaliation claim without making any distinction between claims under the participation clause and opposition clause. Accordingly, the Court assumes that Defendant is moving for summary judgment on both claims.

Under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[54] However, under Eleventh Circuit case law, the participation clause only "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC."[55] Because no EEOC complaint had been filed before Plaintiff's termination, Plaintiff's involvement - if any - in Defendant's internal investigation did not constitute protected expression under the participation clause of Title VII.[56] Accordingly, to the extent Plaintiff is claiming retaliation under the participation clause, summary judgment is due to be **GRANTED** in favor of Defendant.

That leaves Plaintiff's claim of retaliation under the opposition clause.

---

[54] 42 U.S.C. §2000e-3(a).

[55] E.E.O.C. v. Total System Services, Inc., 221 F.3d 1171, 1174 (11th Cir. 2000)

[56] See id.

The opposition clause prohibits discrimination against an employee because "he has opposed any practice made an unlawful employment practice by [Title VII]."[57] Defendant does not deny that Plaintiff "opposed" the mug shot incident, but it contends that Gordon did not have a reasonable belief that Defendant had engaged in an unlawful employment practice. An employee who seeks protection under the opposition clause must have "a good faith, reasonable belief that the employer was engaged in unlawful employment practices."[58] Thus, a plaintiff need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a prima facie case and overcome a motion for summary judgment.[59] "Such a requirement '[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances."[60]

In the instant case, although Defendant characterizes the mug shot incident as an isolated episode, Gordon has offered undisputed evidence of three prior episodes in which Gierschke, who was the General Sales Manager, made sexually explicit statements to Boersma in Gordon's presence. Gordon argues that based on these three episodes, coupled with the mug shot incident, he had a reasonable, objective

---

[57] 42 U.S.C.A. §2000e-3(a).

[58] Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 (11th Cir. 1998)(quoting Little v. United Technologies, Carrier Transicold Division, 103 F.3d 956, 960 (11th Cir. 1997).

[59] Little v. United Technologies, Carrier Transicold Division, 103 F.3d 956, 960 (11th Cir. 1997.)

[60] Little, 103 F.3d at 960 (quoting Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978)).

belief that Boersma was "an office target for sexual harassment and ridicule." [61] While these four episodes may not be sufficiently severe to support a claim for sexual harassment, the Court cannot say as a matter of law that Gordon lacked a reasonable, good faith belief that Boersma was being sexually harassed.[62] Accordingly, the Court concludes that there is a genuine issue of material fact as to whether Gordon engaged in protected activity.

### *Causal Connection*

The next step is to determine whether a causal connection exists between Gordon's protected activity and his termination. To establish a causal connection, Plaintiff must show that the decision-maker was aware of the protected conduct and "that the protected activity and the adverse action were not wholly unrelated."[63] In the absence of any evidence to indicate retaliation, "close temporal proximity" alone can suffice to show a causal connection.[64]

Here, there is no dispute that Hearl was the sole decision-maker in the termination of Plaintiff's employment. Hearl testified that at the time he fired Gordon he was unaware that Gordon had encouraged Boersma to report the mug shot incident.

---

[61] Defendant argues that the mug shot incident was not based on Boersma's sex or gender. However, as discussed above, Gordon contends that Boersma was the victim of a pattern of sexual harassment and ridicule, culminating in the mug shot incident.

[62] See Gupta v. Florida Bd. Of Regents, 212 F.3d 571, 586 (11th Cir. 2000)("[a]lthough the conduct Gupta complained about was not so severe and pervasive that it altered her working conditions, we cannot say that she lacked a 'reasonable good faith belief' that she was being sexually harassed."); Clover v. Total System Services, Inc., 176 F.3d 1346, 1351 (11th Cir. 1999) (the conduct need not actually be sexual harassment to give rise to an objectively reasonable belief that it is, but it must be "close enough" to support an objectively reasonable belief that it is.)

[63] Gupta, 212 F.3d at 590.

[64] McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008.)

Based on this testimony, Defendant argues that Gordon cannot show that the decision-maker was aware of the protected conduct at the time of the adverse employment action. However, Gordon has pointed to circumstantial evidence from which a jury could infer that Hearl had knowledge of the protected conduct at the time he fired Gordon. For example, prior to Gordon's termination several managers at the dealership, including Gierschke, Carpenter, and Pistone knew that Gordon had encouraged Boersma to report the mug shot incident to human resources; Hearl spoke with Gierschke and Carpenter before he fired Gordon; either the day Gordon was fired or the day before he was fired, Carpenter and Pistone told Gordon that he should not have gone to human resources and that they "would have taken care of it" at the Ocala dealership; and immediately before Gordon was fired, he saw Hearl and Carpenter in a "heated discussion."

This circumstantial evidence, along with the very close temporal proximity between the allegedly protected activity and the adverse action – i.e., Hearl terminated Plaintiff approximately one week after Gordon encouraged Boersma to report the incident and on the first day Hearl returned to the dealership after the incident had occurred – is sufficient to create a genuine issue of material fact with respect to the existence of a causal connection between Gordon's termination and the allegedly protected activity.

### ***Legitimate, Non-Retaliatory Reason***

Defendant has proffered a legitimate, non-retaliatory reason for terminating Gordon – i.e., that Gordon was conspiring with other employees to undermine

management.[65] Because Defendant has articulated a legitimate non-retaliatory reason for Gordon's termination, the burden shifts back to Gordon to identify a genuine issue of material fact with regard to whether the proffered reason was pretextual. To show pretext, Gordon must "demonstrate that the proffered reason was not the true reason for the employment decision . . . . [The Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[66] In other words, the Court must assess whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence."[67]

Gordon has met this burden. While there is evidence supporting Defendant's articulated legitimate reason, Gordon has presented circumstantial evidence from which a jury could infer that Defendant terminated Gordon because he encouraged Boersma to report the mug shot incident. As discussed above, Hearl terminated Plaintiff approximately one week after Gordon encouraged Boersma to report the incident and

---

[65] See Meeks v. Computer Associates Int'l., 15 F.3d 1013, 1021 (11th Cir. 1994) (this burden is "exceedingly light," defendants need only proffer legitimate job or business reasons, not prove them). In its Answer and interrogatory answers, Defendant offered two other possible explanations – i.e, lack of performance and reduced sales due to Gordon's hostility to volume selling. Because Defendant did not discuss these other reasons in its Motion for Summary Judgment, the Court will not address these other explanations in this Order.

[66] Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). See also Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir. 1994) ("[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable.") (internal citations omitted).

[67] Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotations and citations omitted).

15

on the first day Hearl returned to the dealership after the incident had occurred. Moreover, Gordon has offered evidence that prior to Gordon's termination several managers at the dealership, including Gierschke, Carpenter, and Pistone knew that Gordon had encouraged Boersma to report the mug shot incident to human resources; Hearl spoke with Gierschke and Carpenter before he fired Gordon; either the day Gordon was fired or the day before he was fired, Carpenter and Pistone told Gordon that he should not have gone to human resources and that they "would have taken care of it" at the Ocala dealership; and immediately before Gordon was fired, he saw Hearl and Carpenter in a "heated discussion."

In addition, Gordon has offered evidence suggesting that Hearl may have manufactured the alleged legitimate reason after the fact. Specifically, Gordon testified that he had a telephone conversation with Lisa Dahl, the comptroller for Honda, and she told him that she saw his "separation notice" shortly after his termination and that it contained Dwayne Hearl's signature at the bottom, but did not contain any remarks explaining the reason for termination. Gordon further attested that Dahl told him that, some time later, she witnessed Blumer visiting the Honda of Ocala store and directing Hearl and Gierschke to meet in an office to get their stories straight and complete the separation notice.[68]

Defendant has moved to strike this portion of Gordon's affidavit on two grounds. First, Defendant contends that it includes new discovery that was not disclosed or provided within the discovery period. However, Rule 56(e) of the Federal Rules of Civil

---

[68] Gordon Affidavit ¶¶ 6-9.

Procedure, clearly provides for the filing of affidavits in opposition to a motion for summary judgment, and the Court is unaware of any legal authority (and Defendant cites none) that stands for the proposition that a party can not supplement existing discovery with evidence in an affidavit.[69]

Second, Defendant argues that the statements allegedly made by Dahl are inadmissible hearsay. Plaintiff contends that Dahl's statements are admissible as non-hearsay admissions under Rule 801(d)(2)(D), Fed.R.Evid. This Rule provides that "[a] statement is not hearsay if – . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." The Eleventh Circuit has held that, "it is not necessary to show that an employee or agent possesses 'speaking authority,' tested by the usual standards of agency law, before a statement can be admitted against the principal."[70] However, to be admissible the content of the declarant's statement must concern a matter within the scope of her agency.[71] Thus, the appropriate inquiry is whether Dahl was authorized to act for Defendant, concerning the matter about which she allegedly spoke.[72] At the time Gordon was terminated, Dahl was the comptroller and the records custodian for Honda of Ocala. Her alleged

---

[69] According to Gordon this is not "new" discovery. Gordon represents that Dahl was named as a witness with relevant information in Defendant's initial disclosure (served February 12, 2008) and Dahl was named by Plaintiff in his interrogatory answers as an employee of Defendant with whom he had conversations after he filed the instant lawsuit (served May 1, 2008.) At Gordon's June 16, 2008 deposition, defense counsel did not inquire about his post-complaint conversation with Dahl and Dahl's deposition that had been noticed for November 11, 2008 was canceled.

[70] Wilkinson v. Carnival Cruise Lines, Inc., 920 F.2d 1560, 1565 (11th Cir. 1991.)

[71] Id.

[72] See id. at 1566.

statements regarding the separation notice were made within the scope of her employment duties as a records custodian for Defendant. As such, the statements allegedly made by Dahl are admissible as non-hearsay admissions under Rule 801(d)(2)(D), Fed.R.Evid.[73]

Considering both Dahl's alleged admissions regarding the separation notice, and the other circumstantial evidence offered by Gordon, the Court is satisfied that Gordon has met his burden to create a genuine issue of material fact as to whether the proffered legitimate non-retaliatory reason was pretextual.

## V. Conclusion

Accordingly, for the reasons discussed above, Defendant, Ocala Automotive Management, LLC d/b/a Honda Of Ocala and d/b/a Morgan Auto Group's Motion For Final Summary Judgment (Doc. 26) is **GRANTED** in favor of Defendant to the extent Plaintiff is claiming retaliation under the participation clause, and otherwise **DENIED**.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on January 20, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel

---

[73] Defendant raised one additional argument as to why Gordon's affidavit should be stricken – i.e., that Gordon's affidavit testimony that Boersma "found these episodes to be a pattern of harassment, culminating in the publication of an earlier police mugshot of her" was not consistent with his deposition testimony. However, Gordon's deposition testimony regarding Boersma's reaction to individual episodes of alleged sexual harassment is not inconsistent with his affidavit testimony that Boersma found the pattern of episodes to be discriminatory. Alternatively, Defendant requested leave to file a reply memorandum. Because additional briefing would not be helpful to resolve the Motion For Summary Judgment, Defendant's request is due to be denied. Accordingly, Defendant's Motion To Strike Affidavit Of Gary Gordon And In The Alternative, Defendant's Motion For Leave To File A Reply To Plaintiff's Memorandum Of Law Opposing Defendant's Motion For Summary Judgment (Doc. 32) is **DENIED.**